UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Mark A. Barnett, Chief Judge

BGH EDELSTAHL SIEGEN GMBH,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

ELLWOOD CITY FORGE COMPANY, *et. al.*,

Defendant-Intervenors.

Ct. No. 26-01186

**ORDER**

Upon consideration of the Rule 56.2 Memorandum in support of its Motion for Judgment upon the Agency Record filed by Plaintiff, BGH Edelstahl Siegen GmbH, and all other papers and proceedings had herein, it is hereby

ORDERED that said motion is GRANTED, and it is further

ORDERED that this case is remanded to the U.S. Department of Commerce, with instructions that Commerce redetermine aspects of its final results of administrative review as instructed by this Court in its accompanying slip opinion.

SO ORDERED.

Date: ______________, 2026
New York, New York

_____________________________
Mark A. Barnett, Chief Judge

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Mark A. Barnett, Chief Judge

| | |
|---|---|
| BGH EDELSTAHL SIEGEN GMBH,<br><br>Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>Defendant,<br><br>and<br><br>ELLWOOD CITY FORGE COMPANY, *et. al.*,<br><br>Defendant-Intervenors. | Ct. No. 26-01186 |

**BGH EDELSTAHL SIEGEN GMBH**
**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, Plaintiff, BGH Edelstahl Siegen GmbH ("BGH"), respectfully moves this Court for an order granting movant judgment on the agency record against Defendant, the United States (representing the U.S. Department of Commerce ("Commerce")), including, but not limited to the following relief:

- Remand to Commerce to reconsider its determination treating home market sales of certain forged steel products not meeting the definitions of fluid end blocks in "finished condition" and "unfinished condition" contained in the product scope description as subject merchandise;
- Remand to Commerce to reconsider its application of a modified differential pricing analysis in this administrative review;

- Granting BGH such other relief as the Court may deem appropriate.

A memorandum of points and authorities in support of this motion is being filed contemporaneously with this motion.

WHEREFORE, for the reasons described in this motion and the accompanying memorandum in support thereof, BGH respectfully requests that the Court enter judgment in its favor. A proposed order is submitted with this motion for the Court's consideration.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine*
J. Kevin Horgan
Merisa A. Horgan
**DEKIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, D.C. 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
Email: montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Date: September 18, 2026

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Mark A. Barnett, Chief Judge

| | |
|---|---|
| BGH EDELSTAHL SIEGEN GMBH, Plaintiff, | |
| v. | |
| UNITED STATES, Defendant, | Ct. No. 26-01186 |
| and | **PUBLIC VERSION** |
| ELLWOOD CITY FORGE COMPANY, *et. al.*, Defendant-Intervenors. | Confidential information deleted on pages 19, 20, 32 & 42. |

**BGH EDELSTAHL SIEGEN GMBH**
**RULE 56.2 MEMORANDUM IN SUPPORT OF**
**MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Marc E. Montalbine
J. Kevin Horgan
Merisa A. Horgan
**deKIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, D.C. 20005
Tel: (202) 783-6900
email: montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Dated: September 18, 2026

## TABLE OF CONTENTS

I. RULE 56.2 STATEMENT ............ 1

A. Administrative Determinations Sought to be Reviewed ............ 1

B. Issues Presented ............ 1

II. STATEMENT OF FACTS ............ 1

A. Original Investigation ............ 2

B. Administrative Review ............ 6

III. SUMMARY OF ARGUMENT ............ 9

A. Product Sope ............ 9

B. Differential Pricing Methodology ............ 11

IV. ARGUMENT ............ 11

A. Standard of Review ............ 11

B. Commerce Improperly Treated Certain Forged Products Sold in the Home Market as Products Under Review ............ 13

1. Statutory Framework ............ 13

2. The Products Under Review Are Expressly Limited to Forged Steel Fluid End Blocks in Finished or Unfinished Condition ............ 15

3. Commerce Improperly Included Home Market Sales of Military Equipment Forgings in Its Dumping Calculations ............ 19

4. Commerce Improperly Included Home Market Sales of Forged Bars in Its Dumping Calculations ............ 31

5. Commerce Failed to Properly Consider Differences in Product Type in Its Antidumping Calculations ............ 34

C. Commerce Improperly Modified its Differential Pricing Methodology During the Course of this Review ............ 35

1. Failure To Provide Adequate Due Process ............................................. 35

2. Commerce's Revised Differential Pricing Analysis Is Contrary to Law and Not Supported by the Administrative Record in This Review ........................................................................................ 39

V. CONCLUSION AND PRAYER FOR RELIEF ........................................................ 47

## TABLE OF AUTHORITIES

**Cases**

ArcelorMittal Stainless Belgium N.V. v. United States,
694 F.3d 82 (Fed. Cir. 2012)........................................................................................16

Atkore Steel Components, Inc. v. United States,
313 F. Supp. 3d 1374 (CIT 2018)................................................................................26

BGH Edelstahl Siegen GmbH v. United States,
804 F. Supp. 3d 1330 (CIT 2025)...........................................................................18, 27

Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States,
222 F. Supp. 3d 1255 (CIT 2017)................................................................................12

Burlington Truck Lines, Inc. v. United States,
371 U.S. 156 (1962)....................................................................................................12

Dibble v. Fenimore,
545 F.3d 208 (2d Cir. 2008)........................................................................................17

Dongbu Steel Co. v. United States,
635 F.3d 1363 (Fed. Cir. 2011)...............................................................................39, 45

Eckstrom Indus., Inc. v. United States,
254 F.3d 1068 (Fed. Cir. 2001)...........................................................................10, 12, 21

Garg Tube Exp. LLP v. United States,
740 F. Supp. 3d 1355 (CIT 2024)................................................................................11

Interval Licensing LLC v. AOL, Inc.,
766 F.3d 1364 (Fed. Cir. 2014)....................................................................................17

Jiaxing Brother Fastener Co. v. United States,
822 F.3d 1289 (Fed. Cir. 2016)....................................................................................12

King Supply Co., LLC v. United States,
674 F.3d 1343 (Fed. Cir. 2012)...............................................................................27, 28

Loper Bright Enterprises v. Raimondo,
144 S.Ct. 2244 (2024)..................................................................................................11

Marmen Inc. v. United States,
134 F.4th 1334 (Fed. Cir. 2025) ...........................................................................*passim*

Mathews v. Eldridge,
424 U.S. 319 (1976)....................36

Mittal Steel Point Lisas Ltd. v. United States,
548 F.3d 1375 (Fed. Cir. 2008)....................35

Meridian Prods., LLC v. United States,
851 F.3d 1375 (Fed. Cir. 2017)....................21

Michigan v. EPA,
576 U.S. 743 (2015)....................12

Nexteel Co. v. United States,
28 F.4th 1226 (Fed. Cir. 2022)....................13, 31

Officine Tecnosider SRL v. United States,
798 F. Supp. 3d 1363 (CIT 2025)....................43

OMG, Inc. v. United States,
972 F.3d 1358 (Fed. Cir. 2020)....................11, 25, 26

OMG, Inc. v. United States,
321 F. Supp. 3d 1262 (CIT 2018)....................25

Pesquera Mares Australes Ltda. v. United States,
266 F.3d 1382 (Fed. Cir. 2001)....................34

Provisur Techs., Inc. v. Weber, Inc.,
50 F.4th 117 (Fed. Cir. 2022)....................12, 31

Royal Brush Mfg. v. United States,
545 F. Supp. 3d 1357 (CIT 2021)....................36

Sec. & Exch. Comm'n v. Chenery Corp.,
318 U.S. 80 (1943)....................12

Shenzhen Xinboda Indus. Co. v. United States,
456 F. Supp. 3d 1272 (CIT 2020)....................12

Stupp Corp. v. United States,
2025 U.S. App. LEXIS 9616 (Fed. Cir. 2025)....................37, 38, 43

Union Steel v. United States,
753 F. Supp. 2d 1317 (CIT 2011)....................34

Wheatland Tube Co. v. United States,
973 F. Supp. 149 (CIT 1997) ........ *passim*

Wheatland Tube Co. v. United States,
161 F.3d 1365 (Fed. Cir. 1998) ........ *passim*

**Statutes**

19 U.S.C. § 1673 ........ 10, 13, 30

19 U.S.C. § 1675 ........ 14

19 U.S.C. § 1675(a)(1)(B) ........ 14

19 U.S.C. § 1675(a)(2)(A) ........ 14

19 U.S.C. § 1677(10) ........ 13

19 U.S.C. § 1677(16) ........ 14

19 U.S.C. § 1677(16)(A) ........ 14, 15, 33, 34

19 U.S.C. § 1677(25) ........ *passim*

19 U.S.C. § 1677b(a)(1)(B)(i) ........ 14

19 U.S.C. § 1677f-1(d)(1)(B) ........ 43, 45

19 U.S.C. § 1677f-1(d)(1)(B)(i) & (ii) ........ 40, 46

**Regulations**

19 C.F.R. § 351.414(d)(3) ........ 46

**Administrative Determinations**

Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Results of the Antidumping Duty Administrative Review; 2023,
91 Fed. Reg. 3433 (Jan. 27, 2026) ........ 1

**Other Authorities**

Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-TA-1466-1468 (Preliminary), USITC Pub. 5017, 11 (Feb. 2020) ........ 4

Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152 (Jan. 2021) ............................... 5

Implementation of the Findings of the WTO Panel in US-Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay Round Agreements Act and Revocations and Partial Revocations of Certain Antidumping Duty Orders, 72 Fed. Reg. 25261 (Dep't Comm. 2007) ............................................................... 45

Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. No. 103-316, vol. 1 (1994) ............................................................................ 40

United States – Antidumping and Countervailing Measures on Large Residential Washers from Korea, Report of the Appellate Body, WT/DS464/AB/R (Sept. 7, 2016) ............................................................................................ 44, 45

U.S. Harmonized Tariff Schedule, HTSUS No. 8413.91.9055 (2023) ...................................... 15

WTO Antidumping Agreement, Art. 2.4.2 ............................................................... 41

Black's Law Dictionary, 895 (11th ed. 2019) ........................................................ 17

Oxford Dictionaries online ........................................................................ 44

Random House Unabridged Dictionary (2d ed. 1993) .................................................. 44

Merriam-Webster's Collegiate Dictionary (11th ed. 2014) ............................................ 44

## I. RULE 56.2 STATEMENT

Pursuant to Rule 56.2(c)(1) of the Rules of this Court, Plaintiff, BGH Edelstahl Siegen GmbH ("BGH" or "BGH Siegen"), hereby states the administrative decision sought to be reviewed and the issues of law presented:

### A. Administrative Determinations Sought to be Reviewed

The U.S. Department of Commerce ("Commerce") published its contested final results of administrative review in the *Federal Register* on January 27, 2026. Forged Steel Fluid End Blocks from the Federal Republic of Germany: Final Results of the Antidumping Duty Administrative Review; 2023, 91 Fed. Reg. 3433 (Jan. 27, 2026) ("Final Results"); *see also* accompanying Issues and Decision Memorandum (Jan. 20, 2026) ("Final IDM") (PR 3 & 4).[1] The weighted-average dumping margin assigned to BGH was 11.92%.

### B. Issues Presented

1. Issue One: Whether Commerce erred in treating home market sales of certain forged steel products not meeting the definitions of fluid end blocks in "finished condition" and "unfinished condition" contained in the product scope description as subject merchandise?

2. Issue Two: Whether Commerce's revised differential pricing analysis, applied late in this administrative review, is contrary to law and unsupported by substantial evidence on the record?

## II. STATEMENT OF FACTS

This proceeding involves the administrative review of the antidumping order on *Forged Steel Fluid End Blocks from Germany* for the period covering January to December 2023 (*i.e.*,

[1] In accordance with the Chambers Procedures of this Court, citations to the confidential record are designated as "CR" and citations to the public record are designated as "PR".

calendar year 2023).

### A. Original Investigation

The product scope applicable to this current administrative review has its genesis in the antidumping and countervailing duty petitions filed by the FEB Fair Trade Coalition, Ellwood Group and Finkl Steel ("Petitioners") in December 2019. These original petitions described the scope of subject merchandise as fluid end blocks ("FEBs"), whether unfinished, semi-finished, or finished. Commerce had numerous questions on how to identify unfinished and semi-finished fluid end blocks, and the Petitioners responded to these questions by submitting an amendment to their antidumping and countervailing duty petitions. *See* Amendment of Petitions and Response to Commerce's Supplemental Questions, (Dec. 30, 2019) ("Petition Amendment") (contained in Section A Questionnaire Response, App. A-2 (June 20, 2024) ("Section A Response")) (PR 58).

For example, Commerce specifically directed Petitioners to "add a definition of what constitutes an unfinished fluid end block in the scope language for clarification purposes." Petition Amendment, 4 (PR 58). In response to this request, Petitioners submitted an amended scope definition removing the reference to "semi-finished" fluid end blocks and adding specific definitions for "finished condition" and "unfinished condition." These definitions state:

> A fluid end block may be imported in finished condition (*i.e.*, ready for incorporation into a pump fluid end assembly without further finishing operations) or unfinished condition (*i.e.*, forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly).

Request For Information, App. III (May 14, 2024) ("Questionnaire") (PR 65).

Commerce also asked Petitioners to "Please expand your discussion of the domestic like product to explain why unfinished and semi-finished fluid end blocks should be part of the same

domestic like product as finished fluid end blocks." Petition Amendment, 5 (PR 58). Petitioners responded that:

> The product scope covers FEBs "whether in finished or unfinished form." All FEBs - whether in finished or unfinished form - comprise a single like product.
>
> The Commission has explained that its "semi-finished analysis generally is appropriate for consideration of whether to define a like product as encompassing both upstream (*i.e.*, semifinished) and downstream (*i.e.*, finished) products." The five factors considered under this analysis are: (1) whether the upstream article is dedicated to the production of the downstream article, or has independent uses; (2) whether there are perceived to be separate markets for the upstream and downstream article; (3) differences in the physical characteristics and functions of the upstream and downstream articles; (4) differences in the cost or value of the vertically differentiated articles; and (5) the significance and extent of the process used to transform the upstream article into the downstream article.
>
> The act of forging steel of a particular chemistry, within the dimensional ranges referenced in the scope, imparts the essential character of the fluid end block. Once these essential operations are performed, the FEB is dedicated for eventual use in the fluid end assembly of a hydraulic pump. Furthermore, ***there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs*** - *i.e.*, they are all sold to pump manufacturers. The only difference is the extent to which the forger or the pump manufacturer elects to perform the finishing functions. Finally, while such finishing operations are not trivial, the cost and value of the fluid end block is principally defined by the manufacturing operations performed by the forger in producing the unfinished FEB.

Id. at 6-7 (citations omitted) (emphasis added) (PR 58).

Representatives for the Petitioners also gave sworn testimony on the limited nature of the product scope at the Staff Conference of the U.S. International Trade Commission ("ITC") during the original injury investigation on January 9, 2020. In response to questions posed by James Stamps, ITC International Trade Analyst, petitioners' representatives stated as follows:

> MR. STAMPS: Thank you. Can unfinished FEB forgings be used for anything else other than for the production of finished FEBs?
>
> MR. SHIRLEY: Mark Shirley, Finkl Steel. No. Once it's forged out to a block like Mr. Boyd described, it is fully dedicated to becoming an FEB.

> MS. SAUNDERS: Kathy Saunders, Ellwood City Forge. I agree. There are certain chemistries and configurations of the fluid end blocks. Once it's forged to that configuration, there's usually no other -- no other opportunity to use it for something else.
>
> MR. LEVY: Mr. Stamps, Jack Levy for Petitioners. Just in the interest of full candor, there are uneconomic uses for these blocks. You could, you know, put them back in the pot as scrap. But, you know, there would be no business reason to do so. So from an economic perspective, once you go through the great expense of producing to a custom chemistry and a customs' forging, and a custom dimension of what you saw in Sample A, at that point you are dealing with a product that is dedicated for use in a fluid end module. And all that remains is the finishing so that it can be employed in that use.

ITC Staff Conference Transcript, 53-54 (Jan. 9, 2020) (contained in Section A Response, App. A-2) (PR 58). Later, during the conference, Mr. Stamps posed the same question to a customer representative in the following exchange:

> MR. STAMPS: Thank you. I have a few questions just to round the circle on some issues. Can the unfinished FEB forgings be used for anything else other than for the production of FEBs, finished FEBs?
>
> MR. LOWREY: Paperweights. Yeah, I back up what Finkl and Ellwood said, nothing.

Id. at 136 (PR 58).

Based upon these sworn submissions and testimony, the ITC found that "unfinished FEBs are an intermediate product ***dedicated exclusively to the production of finished FEBs, with no other uses***" and that "{t}here is no separate market for unfinished FEBs." Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-TA-1466-1468 (Preliminary), USITC Pub. 5017, 11 (Feb. 2020) (emphasis added) ("ITC Preliminary Determination") (*citing* ITC Staff Conference Transcript, 53-54 & 136) (contained in Section A Response, App. A-2) (PR 58). Pursuant to this finding, the ITC based its injury determination on a single domestic like product for finished and unfinished FEBs, which the ITC clearly stated were "dedicated exclusively to the production of finished FEBs." Id. The ITC continued its

finding on the single domestic like product for finished and unfinished FEBs in its final determination and reiterated its understanding that "the information available indicated that all unfinished FEBs are dedicated to the production of finished FEBs and that there is ***no separate market for unfinished FEBs***." Fluid End Blocks from China, Germany, India, and Italy, Inv. Nos. 701-TA-632-635 and 731-TA-1466 and 731-TA-1468 (Final), USITC Pub. 5152, 11-12 (Jan. 2021) (emphasis added) ("ITC Final Determination") (contained in Section A Response, App. A-2) (PR 58).

Accordingly, the extent of the ITC's injury determination was expressly limited to finished FEBs and unfinished FEBs "dedicated exclusively to the production of finished FEBs." The ITC made no injury determination concerning general forged steel products not within the same domestic like product as finished FEBs.

Commerce also relied upon these exact same assurances given to the ITC as the basis for its preliminary and final scope decisions in the original investigation. In its preliminary scope decision memorandum, Commerce stated:

> During the International Trade Commission hearing, the petitioners stated that no opportunity exists to use forged blocks, which meet the "chemistries and configurations" of fluid end blocks, for another purpose and that purchasers sometimes prefer to purchase an unfinished fluid end block and complete varying levels of finishing operations themselves. ***We interpret this statement to mean*** that forged steel blocks meeting the specifications of fluid end blocks, as defined in the scope of the investigations, should be treated as fluid end blocks.

Scope Comments Decision Memorandum for the Preliminary Determinations, 6 (May 18, 2020) (citing ITC Staff Conference Transcript, 53-54) (emphasis added) ("Commerce Preliminary Scope Determination") (contained in Section A Response, App. A-2) (PR 58). Commerce quoted this exact same passage in its final scope decision memorandum. *See* Scope Comments Decision Memorandum for the Final Determinations, 5-6 (Dec. 7, 2020) ("Commerce Final

Scope Determination") (contained in Section A Response, App. A-2) (PR 58). Accordingly, Commerce's understanding that any forged steel blocks meeting the physical specifications listed in the product description should be treated as fluid end blocks is based entirely upon petitioners' ITC testimony that no opportunity exists to use forged blocks meeting these physical specifications for any other purpose than the production of finished fluid end blocks.

**B. Administrative Review**

On March 5, 2024, Commerce published in the *Federal Register* a notice of initiation of administrative review for the antidumping duty order on forged steel fluid end blocks from Germany covering the third review period (*i.e.*, January 1, 2023 to December 31, 2023). Initiation of Antidumping and Countervailing Duty Administrative Reviews, 89 Fed. Reg. 15827 (March 5, 2024) (PR 75). BGH Siegen was named as a respondent.

Commerce issued its initial antidumping questionnaire to BGH Siegen on May 14, 2024. Questionnaire, App. III (PR 65). The description of products under review in Appendix III of the questionnaire stated:

> The products under review are forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps.

Id. at App. III. Appendix III also listed the following specific definitions of the terms "finished condition" and "unfinished condition":

> A fluid end block may be imported in finished condition (*i.e.*, ready for incorporation into a pump fluid end assembly without further finishing operations) or unfinished condition (*i.e.*, forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly).

Id. This definition shows that, whether in finished condition or unfinished condition, a fluid end block is a product designed "for incorporation into a pump fluid end assembly."

In compliance with the definition of products under review, BGH Siegen reported its sales of forged steel fluid end blocks to the United States during the period of review ("POR"). All of these U.S. sales consisted of fluid end blocks imported under HTSUS No. 8413.91.9055. Neither BGH Siegen nor any of its affiliates exported any other forged steel products to the United States falling within the ranges for chemical composition and dimensions listed in the product description.

BGH Siegen reported its home market sales of forged steel blocks in a similar manner. BGH Siegen reported all home market sales of forged steel products to Germany falling within the ranges for chemical composition and dimensions listed in the product description. However, BGH noted that certain of these forged blocks did not meet the definitions of "fluid end blocks" in "finished condition" or "unfinished condition" because they were highly processed forgings designed for specific military equipment and were made according to specific customer drawings ("Military Equipment Forgings"). BGH Siegen specifically identified these transactions by reporting the particular drawing number specified by the customer for each product in the field DRAWINGH. BGH Siegen also provided detailed information on these transactions and the corresponding customer in its questionnaire responses. This information included customer drawings, specifications and sales documentation as well as detailed descriptions concerning the customer and the end products for which the custom blocks were designed. *See* Sections A-D Supplemental Questionnaire Response, App. SB-1 (Dec. 23, 2024) ("Supplemental Sections A-D Response") (PR 37, CR 55 & 54).

BGH Siegen also informed Commerce that an affiliated company, BGH Lippendorf, sold forged bars in the German market that fell within the ranges for chemical composition and dimensions listed in the product description but did not meet the definition of fluid end blocks

due to differences in configuration, core compression and other physical and mechanical properties. BGH Siegen did not report the sales of forged steel bars produced by BGH Lippendorf in its normal home market sales file. Rather, BGH Siegen reported these sales in a separate file of "excluded (non-subject) transactions" and provided a detailed explanation showing why these products did not meet the definition of products under review. This information included an explanation of the differences in product requirements for steel bars and FEBs as well as a detailed description of the forging equipment of the various BGH companies. *See* Section A Response, App. A-2 & A-3 (June 20, 2024) (PR 58, CR 104); BGH Section B Questionnaire Response, App. B-4 & B-5 (July 5, 2024) ("Section B Response") (PR 54, CR 92).

On April 3, 2025, BGH Siegen submitted comments for the preliminary results, reiterating that home market sales of forged bars and Military Equipment Forgings did not meet the definitions of "fluid end blocks" in "finished condition" or "unfinished condition" and therefore should be excluded from the home market sales database when calculating the antidumping duty margin on BGH's U.S. sales of forged steel fluid end blocks. BGH Comments for Preliminary Results, 1-12 (Apr. 3, 2025) (PR 35, CR 37).

On May 14, 2025, Commerce published notice of its preliminary results in the *Federal Register*. Forged Steel Fluid End Blocks from Germany: Preliminary Results of Antidumping Duty Administrative Review 2023, 90 Fed. Reg. 20451 (May. 14, 2025) (PR 27). Contrary to the evidence submitted by BGH showing that home market sales of forged bars and Military Equipment Forgings did not meet the definitions of "fluid end blocks" in "finished condition" or "unfinished condition," Commerce included these transactions in calculating the antidumping duty margin on BGH's U.S. sales of forged steel fluid end blocks. As was done in all prior

segments of this proceeding, Commerce applied its differential pricing methodology using the Cohen's *d* test in calculating the dumping margin. In the preliminary results, Commerce determined an estimated weighted-average dumping margin for BGH Siegen of 8.90%

On June 4, 2025, BGH submitted a case brief to Commerce and, on June 11, 2025, petitioners submitted a rebuttal brief. BGH Case Brief (June 4, 2025) (PR 25, CR 10).

On August 26, 2025, Commerce issued a Post-Preliminary Analysis memorandum. In this analysis, Commerce applied a modified differential pricing methodology and increased BGH's estimated weighted-average dumping margin to 11.92%. Post-Preliminary Analysis for Administrative Review of Fluid End Blocks from Germany; 2023, (Aug. 26, 2025) ("Post-Preliminary Analysis"). On September 10, 2025, BGH submitted comments on the Post-Preliminary Analysis to Commerce. Comments on Post-Preliminary Analysis (Sept.10, 2025) (PR 13). Petitioners did not submit any comments on the Post-Preliminary Analysis.

On January 27, 2026, Commerce published notice of its final results in the *Federal Register*. Final Results, 91 Fed. Reg. 3433 (Jan. 27, 2026) (PR 3). In the Final Results, Commerce continued to include home market sales of forged bars and Military Equipment Forgings in calculating the antidumping duty margin on BGH's U.S. sales of forged steel fluid end blocks. Commerce also continued to apply its modified differential pricing methodology, and the weighted-average dumping margin for BGH Siegen remained unchanged at 11.92%.

## III. SUMMARY OF ARGUMENT

### A. Product Scope

In its final results, Commerce improperly treated certain forged products (Military Equipment Forgings and forged bars) sold in the home market as "subject merchandise" and included sales of these products in its margin calculations even though these products did not

meet the definitions of fluid end blocks in "finished condition" and "unfinished condition" contained in the product scope description. The definitions of "finished condition" and "unfinished condition" were specifically added to the product scope at the request of Commerce in order to clarify "what constitutes an unfinished fluid end block in the scope language." *See* Petition Amendment, 4-5 (PR 58). These definitions also embodied Petitioners' sworn statements that "unfinished fluid end blocks" were "dedicated for eventual use in the fluid end assembly of a hydraulic pump" and that "there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs." Id. at 6. Accordingly, these definitions serve as limiting requirements that must be fulfilled in determining subject merchandise and form a crucial part of the product scope description.

Commerce therefore erred when it simply ignored these specific definitions of "finished condition" and "unfinished condition" in determining that Military Equipment Forgings and forged bars fell within the scope description of the antidumping duty order. *See* Eckstrom Indus. v. United States, 254 F.3d 1068, 1073 (Fed. Cir. 2001) (stating that Commerce errs when it treats limiting language in the scope of an antidumping order as mere surplusage).

Commerce's inclusion of Military Equipment Forgings and forged bars within the scope of this proceeding also serves to expand the scope beyond the limits of the ITC injury determination in contravention of *Wheatland Tube*. *See* Wheatland Tube Co. v. United States, 973 F. Supp. 149, 158 (CIT 1997), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998) (citing 19 U.S.C. § 1673 (1994)). Having argued a narrow construction of the product scope in order to obtain findings of material injury, Petitioners cannot now seek a broader interpretation of the product scope during enforcement of the orders in an administrative review.

**B. Differential Pricing Methodology**

Commerce's introduction of a modified differential pricing methodology at the end of this proceeding, long after issuance of the preliminary results and the close of briefing, violated BGH's rights of due process. Commerce's revised differential pricing analysis also continues to suffer from the same lack of statistical analysis and significance as found by the U.S. Court of Appeals for the Federal Circuit in *Marmen*. Indeed, in abandoning all statistical criteria and simply applying irrebuttable thresholds, Commerce has made its analysis less precise and incapable of determining any pattern of significant price differences as required by statute. The revised methodology is in no way tailored to the facts on the record of this administrative review. The revised methodology is therefore contrary to law and unsupported by substantial evidence on the record.

## IV. ARGUMENT

### A. Standard of Review

Courts exercise their independent judgment in deciding statutory meaning and in deciding whether an agency has acted within its statutory authority. *See*, Garg Tube Exp. LLP v. United States, 740 F. Supp. 3d 1355, 1365 (CIT 2024) (citing Loper Bright Enterprises v. Raimondo, 144 S.Ct. 2244, 2263 & 2273 (2024)). When reviewing Commerce's determination concerning the description of products under review in a proceeding, the question of whether the unambiguous terms of the scope language control or whether some ambiguity exists is a question of law. OMG, Inc. v. United States, 972 F.3d 1358, 1363 (Fed. Cir. 2020). The question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence. Id. at 1364. Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1071 (Fed. Cir. 2001).

Each administrative review is a separate segment of an antidumping proceeding with its own, unique administrative record. Jiaxing Brother Fastener Co. v. United States, 822 F.3d 1289, 1299 (Fed. Cir. 2016). A determination must be supported by substantial evidence based on the administrative record of the specific review in question. Shenzhen Xinboda Indus. Co. v. United States, 456 F. Supp. 3d 1272, 1285 n.22 (CIT 2020).

Judicial review of agency action is limited to "the grounds that the agency invoked when it took the action." Michigan v. EPA, 576 U.S. 743, 758 (2015) (citing Sec. & Exch. Comm'n v. Chenery Corp., 318 U.S. 80, 87 (1943)). An "administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." Chenery, 318 U.S. at 95. "An agency's determination thus cannot be sustained on the basis of a rationale supplied after the fact - whether by the agency's litigation counsel, by another party, or by the court." Borusan Mannesmann Boru Sanayi Ve Ticaret A.S. v. United States, 222 F. Supp. 3d 1255, 1267 (CIT 2017) (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962)).

An agency violates the arbitrary and capricious standard when it fails entirely to consider a party's arguments. *See* Provisur Techs., Inc. v. Weber, Inc., 50 F.4th 117, 123-24 (Fed. Cir. 2022) (finding that the Patent Trial and Appeal Board violated the APA with its failure to address a party's arguments regarding patent invalidity and remanding for further proceedings). A court may not take the place of the agency by analyzing and disposing of such forgotten issues. Rather, the court must remand such issues back to the agency for further consideration.

*See*, Nexteel Co. v. United States, 28 F.4th 1226, 1238 (Fed. Cir. 2022) (discussing the CIT's duty to remand for further consideration).

### B. Commerce Improperly Treated Certain Forged Products Sold in the Home Market as Products Under Review

In its final results, Commerce improperly treated certain forged steel products sold in the home market as subject merchandise, including them in its dumping calculations, even though these products did not meet the express description of the products under review.

#### 1. Statutory Framework

Commerce imposes an antidumping duty on foreign merchandise that "is being, or is likely to be, sold in the United States at less than its fair value" and results in material injury or threat of material injury to a U.S. domestic industry. 19 U.S.C. § 1673. Material injury is examined by the U.S. International Trade Commission ("ITC") during the original investigation. The ITC injury determination is limited to a specifically defined domestic like product corresponding to the subject merchandise as confirmed during the investigation. *See* 19 U.S.C. § 1677(10). Commerce may not expand the scope of a proceeding "beyond the limits of the ITC injury determination." Wheatland Tube Co. v. United States, 973 F. Supp. 149, 158 (CIT 1997), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998) (citing 19 U.S.C. § 1673 (1994)).

In the underlying injury investigation, the ITC based its determination of material injury upon a single domestic like product consisting of finished FEBs and unfinished FEBs which were specifically defined as "dedicated for eventual use in the FEM of a hydraulic pump."[2] ITC Preliminary Determination, 10 (PR 58). In defining the domestic like product in this manner, the

[2] "FEM" refers to fluid end modules, which are incorporated into hydraulic pumps. ITC Final Determination, 10 (PR 58).

ITC specifically noted that "Petitioners argue that ***all parties agree*** that ***an unfinished FEB is dedicated for eventual use in the FEM of a hydraulic pump***." Id. (emphasis added).

If the ITC finds material injury and Commerce finds dumping, Commerce will publish an antidumping duty order setting estimated weighted-average dumping margins for the investigated respondents and an "all others" rate for non-investigated companies. Pursuant to 19 U.S.C. § 1675, Commerce will conduct an annual administrative review of an existing antidumping duty order if a timely request for such a review has been received after publication of the notice of opportunity to request administrative review in the *Federal Register*. 19 U.S.C. § 1675(a)(1)(B). In such a review, Commerce determines the amount of any antidumping duty by determining the normal value and export price (or constructed export price) of each entry of the subject merchandise during the period of review and the dumping margin for each such entry. Id. at § 1675(a)(2)(A).

The normal value of the subject merchandise is usually "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade and, to the extent practicable, at the same level of trade as the export price or constructed export price." 19 U.S.C. § 1677b(a)(1)(B)(i). The term "foreign like product" is defined in 19 U.S.C. § 1677(16). This provision lists three categories of merchandise in order of priority (A)-(C), with the first category consisting of "{t}he subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that merchandise." 19 U.S.C. § 1677(16)(A). Subject merchandise is, in turn, defined as "the class or kind of merchandise that is within the scope of . . . a review." 19 U.S.C. § 1677(25).

In this administrative review, Commerce based its determination of foreign like product exclusively upon the first part of section 1677(16)(A), stating that products falling "within the height, width, and length dimensions listed in the scope language . . . qualify as subject merchandise as outlined by section 771(16) of the Act." Final IDM, 5 (referring to 19 U.S.C. § 1677(16)(A)) (PR 4).

**2. The Products Under Review Are Expressly Limited to Forged Steel Fluid End Blocks in Finished or Unfinished Condition**

The first sentence of the product description in this proceeding describes the products under review as follows:

> The products under review are forged steel fluid end blocks (fluid end blocks), whether in finished or unfinished form, and which are typically used in the manufacture or service of hydraulic pumps.

Questionnaire, App. III (PR 65). As shown by the U.S. Harmonized Tariff Schedule, a fluid end block ("FEB") is a specifically defined part of hydraulic fluid power pumps. U.S. Harmonized Tariff Schedule, HTSUS No. 8413.91.9055 (2023).

| Heading/ Subheading | Stat. Suf-fix | Article Description |
|---|---|---|
| 8413 (con.) | | Pumps for liquids, whether or not fitted with a measuring device; liquid elevators; part thereof: (con.) |
| | | Parts: |
| 8413.91 | | Of pumps: |
| 8413.91.10 | 00 | Of fuel-injection pumps for compression-ignition engines........ |
| 8413.91.20 | 00 | Of stock pumps imported for use with machines for making cellulosic pulp, paper or paperboard... |
| 8413.91.90 | | Other........ |
| | 10 | Of subheading 8413.30.90[6/]........ |
| | | Of hydraulic fluid power pumps: |
| | 55 | Fluid end blocks........ |
| | 60 | Other........ |

Harmonized Tariff Schedule of the United States (2023). Similarly, as explained by the ITC in its final determination in the underlying injury investigation, "FEBs are steel forgings that are a component of fluid end modules ("FEMs"), which are incorporated into hydraulic pumps." ITC Final Determination, 10 (PR 58).

Under these product descriptions, the definition of a finished fluid end block is clear, and this unambiguous, plain meaning of fluid end blocks must form the foundation for Commerce's interpretation of the product scope in this review. *See* ArcelorMittal Stainless Belgium N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012) (stating that when scope language "is not ambiguous, the plain meaning of the language governs").

As detailed above in the Statement of Facts, Commerce did not fully accept the original product description contained in the initial antidumping and countervailing duty petitions submitted by Petitioners. Rather, Commerce required additional "clarification" as to the

definition of "unfinished" fluid end blocks. Commerce directed Petitioners to "add a definition of what constitutes an unfinished fluid end block in the scope language" and to "to explain why unfinished and semi-finished fluid end blocks should be part of the same domestic like product as finished fluid end blocks." Petition Amendment, 4-7 (PR 58). Based upon Commerce's request, Petitioners submitted an amended scope definition adding specific definitions for "finished condition" and "unfinished condition" and explained that "there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs - *i.e.*, they are all sold to pump manufacturers" and that "{a}ll FEBs - whether in finished or unfinished form - comprise a single like product." Id. at 5-7.

The product definitions added to the scope description at the explicit request of Commerce state:

> A fluid end block may be imported in finished condition (*i.e.*, ready for incorporation into a pump fluid end assembly without further finishing operations) or unfinished condition (*i.e.*, forged but still requiring one or more finishing operations before it is ready for incorporation into a pump fluid end assembly).

Questionnaire, App. III (PR 65). This definition shows that, whether in finished condition or unfinished condition, a fluid end block is a product designed "for incorporation into a pump fluid end assembly." The use of the Latin abbreviation "*i.e.,*" which stands for "*id est*" meaning "that is," provides a limiting description of the given term. *See* Black's Law Dictionary, 895 (11th ed. 2019). The use of "*i.e.*" indicates an exhaustive list or definition rather than an example. *See* Interval Licensing LLC v. AOL, Inc., 766 F.3d 1364, 1373 (Fed. Cir. 2014); Dibble v. Fenimore, 545 F.3d 208, 219 (2d Cir. 2008). It is also important to note that these definitions are not in any way qualified by phrases such as "typically used." Thus, whether in finished or unfinished condition, fluid end blocks are designed and intended for "incorporation into a pump fluid end

assembly."

Accordingly, the definitions of fluid end blocks in "finished condition" and "unfinished condition" are not mere examples but rather limiting requirements that must be fulfilled in determining subject merchandise. It must also be remembered, as explained above, that these definitions were not originally part of the product scope but were added later when Petitioner's amended the petitions to address Commerce's concerns on how to identify unfinished fluid end blocks. The ITC also expressly relied upon Petitioners' assurances that "there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs" and that "{a}ll FEBs - whether in finished or unfinished form - comprise a single like product" in basing its injury determination on a single domestic like product for finished and unfinished FEBs "dedicated to the production of finished FEBs." *See* Petition Amendment, 5-7; ITC Final Determination, 11-12 (PR 58).

Therefore, the plain, common meaning of "fluid end blocks" and the specific definitions of "finished condition" and "unfinished condition" serve as the outer limits of what products can be considered as subject merchandise in this review.

In its final results, Commerce fails to analyze or discuss the express definitions of "finished condition" and "unfinished condition" other than to repeat them in its recitation of the "Scope of the Order."[3] Final IDM, 2-3 (PR 4). As these definitions were specifically added at the behest of Commerce to clarify the products covered by these proceedings, any scope interpretation that fails to give meaning to these definitions cannot be sustained.

---

[3] Similarly, in *BGH Edelstahl*, the Court did not analyze or discuss these definitions other than referencing them in the Background section of the opinion. *See* BGH Edelstahl Siegen GmbH v. United States, 804 F. Supp. 3d 1330, 1334 (CIT 2025).

### 3. Commerce Improperly Included Home Market Sales of Military Equipment Forgings in Its Dumping Calculations

BGH provided a plethora of factual information on the record of this current administrative review demonstrating that the Military Equipment Forgings sold in the home market did not meet the definitions of "fluid end blocks" in "finished condition" or "unfinished condition" and therefore did not qualifying as "subject merchandise" under 19 U.S.C. § 1677(25).

All Military Equipment Forgings sold in the home market during the period of review were sold to the customer [ ]. These Military Equipment Forgings are highly processed forgings designed for the manufacture of specific military equipment and are made according to specific customer drawings. *See* Sections A-D Supplemental Response, 10-11 & App. SB-1 (PR 37, CR 58, 55 & 54). The number of each customer drawing is reported in the field DRAWINGH of BGH's home market sales file. Id.

The customer [ ] manufactures specific military equipment such as [ ]. Id. at 10 & App. SB-1. All of the forged blocks sold to [ ] during the POR were to make parts for such [ ]. This is confirmed by the specifications and drawings supplied by [ ] to BGH. While these documents are highly sensitive due to their military nature, an applicable page of [ ] is contained in Appendix SB-1 of the Section A-D supplemental response. [ ]." Id. at App. SB-1. The

specification also requires the products to be manufactured according to [

]. Id.

Excerpts of the sensitive customer drawing for [

] are also included in Appendix SB-1 of the Section A-D supplemental response. As shown by this drawing, the product is highly processed and no longer in the form of a steel block.

[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]
[ ]

Id. at App. SB-1, p. 52 (customer drawing). Therefore, because of this major processing, the forging is designed and manufactured exclusively for specifically designated military equipment and can in no respect be considered as a fluid end block.

Indeed, these Military Equipment Forgings fail to meet the specific definition of "fluid end blocks" in "finished condition" expressed in the product scope. Namely, these Military Equipment Forgings are not "ready for incorporation into a pump fluid end assembly without further finishing operations." *See* Questionnaire, App. III (PR 65). These specially produced forgings also fail to meet the specific definition of "fluid end blocks" in "unfinished condition." Due to their detailed processing, shaping and contouring, these forgings are specially designed and produced for incorporation into a specific item of military equipment. Therefore, additional

finishing operations would not make them "ready for incorporation into a pump fluid end assembly" as required by the definition of "fluid end blocks" in "unfinished condition." Rather, as shown by the customer drawings above, while the Military Equipment Forgings have general outer dimensions falling within the broad dimensions listed in the product scope, the inside of the forgings have essentially been hollowed out and contoured to meet the dedicated design for military equipment.

In its final results, Commerce completely failed to analyze or discuss the express definitions of "finished condition" and "unfinished condition" other than to repeat them in its recitation of the "Scope of the Order." Final IDM, 2-3 (PR 4). Rather, Commerce treated as "subject merchandise" any product falling "within the height, width, and length dimensions listed in the scope language." Id. at 5. However, Commerce cannot simply ignore crucial elements of the product scope like the definitions of "finished condition" and "unfinished condition." As this Court explained in *Eckstrom*, Commerce errs when it treats limiting language in the scope of an antidumping order as mere surplusage. Eckstrom Indus. v. United States, 254 F.3d 1068, 1073 (Fed. Cir. 2001). Moreover, Commerce must properly consider all the terms when making a scope interpretation. Meridian Prods., LLC v. United States, 851 F.3d 1375, 1383 (Fed. Cir. 2017).

This is especially true when the definitions of "finished condition" and "unfinished condition" were specifically added to the product scope at the request of Commerce in order to clarify "what constitutes an unfinished fluid end block in the scope language." Petition Amendment, 4-5 (PR 58). Here, it is important to understand that the original scope language contained the same description of physical characteristics as in the current version of the product scope. Nevertheless, Commerce found it necessary to revise the scope language to include "a

definition of what constitutes an unfinished fluid end block . . . for clarification purposes." Id. The physical characteristics were simply not sufficient to clarify how broad the term "unfinished fluid end block" was to be interpreted.

Commerce's request that Petitioners revise the product scope to include a definition of what constitutes an unfinished fluid end block must also be seen in conjunction with its request that Petitioners "explain why unfinished and semi-finished fluid end blocks should be part of the same domestic like product as finished fluid end blocks." Id. at 5-7. While the term finished fluid end blocks was clearly understood from the tariff schedules and industry practice, Commerce required additional information to clarify how broad the term "unfinished fluid end blocks" was to be interpreted. Petitioners' response established that the term "unfinished fluid end blocks" was to be narrowly interpreted as being "dedicated for eventual use in the fluid end assembly of a hydraulic pump" and that "there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs - *i.e.*, they are all sold to pump manufacturers." Id. at 6. This narrow interpretation of unfinished fluid end blocks is also reflected in the definition of "unfinished condition" added to the scope language, which expressly links both finished and unfinished FEBs to "incorporation into a pump fluid end assembly." Questionnaire, App. III (PR 65).

Therefore, the definitions of fluid end blocks in "finished condition" and "unfinished condition" are crucial elements limiting the extent of the product scope, and Commerce cannot properly ignore these definitions. By ignoring these express definitions, Commerce improperly expanded the product scope to include any unfinished item of forged steel meeting the physical characteristics listed in the product description. However, none of the physical characteristics listed in the product description can properly be construed as expanding the scope of

merchandise beyond the group of products defined as fluid end blocks ("FEBs") in finished or unfinished condition.

For example, the product dimensions do not state that any forged steel item meeting the broad dimensional ranges is a subject FEB. To the contrary, the dimensional ranges are expressly limited to products that are already defined as "fluid end blocks" either "cut-to-length" or in "strings." Questionnaire, App. III (PR 65). Thus, a product first has to meet the definitions of fluid end blocks in finished or unfinished condition and then meet the dimensional ranges to satisfy the description of products under review. These dimensional ranges are also too broad and variable to cover only forged steel items that are fluid end blocks. This is indeed why Commerce directed Petitioners to "add a definition of what constitutes an unfinished fluid end block in the scope language for clarification purposes." Petition Amendment, 4 (PR 58). For example, the dimensions would cover a forged steel item roughly as small as a shoe box (*i.e.*, 8" x 8" x 11") to larger than a standard refrigerator (*i.e.*, 40" x 40" x 75"). Id. The dimensional ranges also permit many disproportional configurations, such as 8" high x 8" wide x 75" long (*i.e.*, over 6 feet long), not suitable for the production of fluid end blocks. Id.

Similarly, the chemical elements listed under the definition of "steel" do not state that any forged steel article meeting the broad chemical ranges is a subject FEB. Id. Rather, the broad chemical ranges encompass a wide variety of standard steel grades such as AISI/SAE "grades 4130, 4135, 4140, 4320, 4330, 4340, 8630, 15-5, 17-4, F6NM, F22, F60, and XM25" used in a number of different products. Id. This is indeed why Commerce directed Petitioners to "add a definition of what constitutes an unfinished fluid end block in the scope language for clarification purposes." Petition Amendment, 4 (PR 58). Under a full reading of the revised product scope, a forged steel item produced from one of these steel grades would still have to

meet the definition of a fluid end block in finished or unfinished condition in order to qualify as subject merchandise or foreign like product.

Commerce's determination to treat Military Equipment Forgings as subject merchandise is based entirely upon its refusal to apply the plain meaning of the definitions of fluid end blocks in "finished condition" and "unfinished condition" contained in the product scope description. In rejecting BGH's argument that Military Equipment Forgings are not covered by the scope, Commerce claims that "neither the scope description nor the physical characteristics used for matching reference a product's end use, nor do they take customization into account." Final IDM, 10 (PR 4). However, as explained above, the definitions of fluid end blocks in "finished condition" and "unfinished condition" both specifically require that the product be designed "for incorporation into a pump fluid end assembly." Questionnaire, App. III (PR 65).

These definitions are a crucial element of the scope description and were added at the express direction of Commerce specifically because the description of physical characteristics was not sufficient to clarify "what constitutes an unfinished fluid end block in the scope language." Petition Amendment, 4-5 (PR 58). These definitions also embodied Petitioners' statements that "unfinished fluid end blocks" were "dedicated for eventual use in the fluid end assembly of a hydraulic pump" and that "there are no separate markets or functions for unfinished FEBs as distinct from finished FEBs." Id. at 6. Accordingly, these definitions serve as limiting requirements that must be fulfilled in determining subject merchandise. Moreover, how a specific product is designed and produced and its level of customization are all relevant criteria in determining whether the definitions of fluid end blocks in "finished condition" and "unfinished condition" contained in the product scope description are met.

In its final results, Commerce also incorrectly conflates end-use with function and

design. *See* Final IDM, 5 (PR 4). BGH did not argue that a forged steel item manufactured for suitability as a finished or unfinished fluid end block must actually be used in the manufacture of hydraulic pumps in order to be considered subject merchandise. In fact, BGH has reported its home market sales of forged steel blocks irregardless of how the customer will use the forged blocks. Rather, it is only those specific articles, such as Military Equipment Forgings and forged bars, which do not meet the definitions fluid end blocks in "finished condition" and "unfinished condition," that BGH requested be excluded from Commerce's antidumping margin calculations. BGH's argument is based upon the plain, common meaning of "fluid end blocks" and the specific definitions for "finished condition" and "unfinished condition" contained in the product description. These definitions relate to the function and design of the product, which are always relevant in determining whether a product falls within the given definition of subject merchandise.

This is clearly seen by the analysis in *OMG* where the Court considered whether a certain fastener met the product description of the antidumping and countervailing duty orders on *Certain Steel Nails from Vietnam*. In that case, the Court determined that the plain meaning of the term "nail" was a "slim, usually pointed object used as a fastener designed for impact insertion." OMG, Inc. v. United States, 321 F. Supp. 3d 1262, 1268-69 (CIT 2018), *aff'd*, 972 F.3d 1358 (Fed. Cir. 2020). The Court then reasoned that the anchor fasteners at issue in that case did not qualify as "nails" because they were "not inserted by impact into the materials to be fastened." Id. at 1269. The Court thereby overturned Commerce's determination that the anchor fasteners were within the scope of the orders. The Court's decision was affirmed on appeal. OMG, Inc. v. United States, 972 F.3d 1358 (Fed. Cir. 2020).

Similarly, in *Atkore*, the Court held that Commerce's interpretation of the term "pipe" in

the phrase “certain malleable iron pipe fittings” to include electrical conduit fittings was unlawful. Atkore Steel Components, Inc. v. United States, 313 F. Supp. 3d 1374, 1385-86 (CIT 2018). Although conduit fittings are a type of pipe fitting and otherwise satisfied the physical characteristics described in the scope language, the petition documents showed that the term “pipe” as used in the petition was “designed to . . . withstand pressure and temperature changes typical of oil, gas, or sprinkler applications.” Id. at 1385. Accordingly, the Court interpreted “pipe” as a limiting term that implied certain requirements, such as pressure tolerance, even though those requirements were not explicitly stated in the scope language.

The same type of analysis is relevant to this proceeding. The plain, common meaning of fluid end blocks is a component of hydraulic pumps. As in the case of defining nails or pipe, this is a question of design and function. Forged steel products that are not designed to function as components for hydraulic pumps do not meet the definition of fluid end blocks or the definitions of finished or unfinished condition.

Commerce’s discussion of *OMG* and *Atkore* in its final results is confused and inconsistent. Commerce attempts to differentiate *OMG* by claiming that the scope language in that case was “unambiguous.” Final IDM, 7 (PR 4). It then seeks to differentiate *Atkore* by claiming that the scope language in that case was “ambiguous.” Id. at 8. In fact, in discussing *OMG*, Commerce seems to state that the scope language in this current review is ambiguous because “there is no agreement on the meaning of the term ‘fluid end blocks.’” Id.

In any event, both *OMG* and *Atkore* represent cases in which the Court looked to evidence concerning the function and design of a product and found that those products were not covered by the scope even though the products satisfied the physical characteristics described in

the scope language. These cases are therefore directly relevant to the proper interpretation of the scope language in this review.

Commerce's citation of *BGH Edelstahl* for the proposition that its "'reliance on the language of the scope description alone' to interpret and determine whether the products at issue were 'fluid end blocks'" was lawful is misplaced. *See* Final IDM, 8 (quoting BGH Edelstahl, 804 F. Supp. 3d at 1339) (PR 4). As detailed above, Commerce did not rely on the language of the scope description to interpret and determine whether the products at issue were "fluid end blocks." Rather, Commerce's interpretation ignored the crucial definitions of "finished condition" and "unfinished condition" added to the scope description at the request of Commerce specifically to clarify "what constitutes an unfinished fluid end block in the scope language." *See* Petition Amendment, 4-5 (PR 58). Commerce therefore erred in ignoring these express product definitions and the factual information provided by BGH when it determined that Military Equipment Forgings "fall within the scope description of the *Order*." *See* Final IDM, 10 (PR 4).

Commerce's reliance upon *King Supply* is also inapposite. *See* Final IDM, 6 (PR 4). *King Supply* involved a product, "carbon steel butt-weld pipe fittings," that could be designed for suitability in a number of different applications, including piping systems to convey gases or liquids and structural applications, such as fences, guardrails, play-ground equipment, and scaffolding. King Supply Co., LLC v. United States, 674 F.3d 1343, 1346 (Fed. Cir. 2012). In fact, the underlying ITC injury determination specifically listed all of these potential applications and was based upon a domestic like product that included "*all* pipe fittings . . . *regardless of use*." Id. at 1346. Based upon this broad wording, Commerce determined that butt-weld pipe fittings imported into the United States "for structural use in applications such as handrails,

fencing, and guardrails" were subject to the applicable antidumping duty order. Id. at 1347.

The situation in this present case is vastly different from the situation in *King Supply*. The product scope in this case is based upon a product having a precise definition with respect to design and application for hydraulic pumps, and the product description clearly defines both finished and unfinished fluid end blocks in relation to their suitability for "incorporation into a pump fluid end assembly." The underlying ITC injury determination was also specifically limited to a single domestic like product for finished and unfinished FEBs "dedicated exclusively to the production of finished FEBs" based upon sworn evidence presented by the U.S. industry, itself.

*King Supply* also involved a scope ruling pertaining to whether merchandise imported into the United States would be subject to the antidumping duty order. By contrast, this present case is limited to the narrow issue of whether certain enumerated home market sales transactions should be matched with U.S. sales in Commerce's margin calculations. All of BGH Siegen's sales of subject merchandise to the United States during the period of review ("POR") consisted of fluid end blocks imported under HTSUS No. 8413.91.9055. Neither BGH Siegen nor any of its affiliates exported any other forged steel products to the United States falling within the ranges for chemical composition and dimensions listed in the product description. Accordingly, Commerce incorrectly referenced possible "enforcement issues" at the "border" in its final results. *See* Final IDM, 6 (PR 4).

In any event, *King Supply* did not prohibit end-use restrictions in antidumping orders but rather specifically noted that such restrictions are appropriately utilized in certain cases. King Supply, 674 F.3d at 1348. The court's only point was that end-use restrictions should be based upon clear exclusionary language. Id. at 1349. As discussed above, the exclusionary language

used in the definitions of the terms "finished condition" and "unfinished condition" in the product description clearly state that, whether in finished or unfinished condition, fluid end blocks are designed and intended for "incorporation into a pump fluid end assembly." These definitions are clear and are not in any way qualified by phrases such as "typically used."

Moreover, to the extent that one could claim any lack of clarity in the exclusionary language in the product scope in this case, it is due to the Petitioners' sworn assurances provided to Commerce and the ITC during the original investigation that no opportunity exists to use forged blocks that meet the chemistries and configurations listed in the product scope for any purpose other than incorporation into a pump fluid end assembly. As is clear from its *Scope Comments Decision Memorandum for the Preliminary Determinations*, Commerce interpreted these statements to mean that no additional exclusionary language was necessary. *See* Preliminary Scope Determination, 6 (PR 58).

In addition, based upon the Petitioners' sworn statements, the ITC expressly limited its injury determination to finished FEBs and unfinished FEBs "dedicated exclusively to the production of finished FEBs" and made no injury determination concerning general forged steel products not within the same domestic like product as finished FEBs. ITC Final Determination, 11-12 (PR 58). Thus, having argued a narrow construction of the product scope in order to obtain findings of material injury, Petitioners cannot now seek a broader interpretation of the product scope during enforcement of the orders in an administrative review.

It is a well-established principle of U.S. international trade law that Commerce may not expand the scope of a proceeding "beyond the limits of the ITC injury determination." Wheatland Tube Co. v. United States, 973 F. Supp. 149, 158 (CIT 1997), *aff'd*, 161 F.3d 1365 (Fed. Cir. 1998) (citing 19 U.S.C. § 1673 (1994)). In *Wheatland Tube*, the CIT explained:

> A fundamental requirement of both U.S. and international law is that an antidumping duty order must be supported by an ITC determination of material injury covering the merchandise in question. . . . It would follow that any expansion of the scope by Commerce would extend the antidumping duty order beyond the limits of the ITC injury determination and would therefore violate both U.S. and international law.

Wheatland Tube, 973 F. Supp. at 158 (citing 19 U.S.C. § 1673 (1994)).

On appeal, the U.S. Court of Appeals for the Federal Circuit ("CAFC" or "Federal Circuit") affirmed the decision in *Wheatland Tube*, finding that the scope of the applicable antidumping duty orders on *Certain Circular Welded Non-Alloy Steel Pipe and Tube* should not be expanded to cover line pipe. Wheatland Tube Co. v. United States, 161 F.3d 1365 (Fed. Cir. 1998). In particular, the court stressed that, during the antidumping investigation, the petitioner, Wheatland, testified that "pipe entering as line pipe would be outside the scope of the petitions." Id. at 1369. The court reasoned that:

> The International Trade Commission's (ITC) reliance on these statements in conducting its injury analysis makes Wheatland's new position especially untenable. As a result of Wheatland's representations, the ITC did not "examine the impact of imports of line pipe upon the domestic industry." It is possible that the ITC would not have found domestic injury if it had examined line pipe imports. Having argued that the orders should exclude line and dual-certified pipe regardless of actual use in order to obtain the antidumping duty orders, Wheatland cannot now urge a broader interpretation during enforcement of the orders.

Id. (citation omitted).

Just like the petitioner in *Wheatland Tube*, the FEB Petitioners in this case argued a narrow construction of the product scope limiting it to forged steel blocks dedicated for eventual use in the fluid end assembly of a hydraulic pump in order to obtain the antidumping and countervailing orders. It is possible that the ITC would not have found domestic injury if it had examined all forged steel products regardless of application and customer market. Therefore, as in *Wheatland Tube*, the Petitioners cannot now urge a broader interpretation during enforcement

of the orders in an administrative review.[4]

Accordingly, as detailed above, the evidence on the administrative record of this case, demonstrates that Military Equipment Forgings have been produced in such a manner that they do not meet the definitions of "fluid end blocks" in "finished condition" or "unfinished condition" and therefore do not qualifying as "subject merchandise" under 19 U.S.C. § 1677(25). Commerce therefore erred in including sales of these products in its margin calculations.

**4. Commerce Improperly Included Home Market Sales of Forged Bars in Its Dumping Calculations**

As with Military Equipment Forgings discussed above, BGH provided detailed factual information on the record of this current administrative review demonstrating that the forged bars sold in the home market did not meet the definitions of "fluid end blocks" in "finished condition" or "unfinished condition" and therefore did not qualifying as "subject merchandise" under 19 U.S.C. § 1677(25).

As explained in BGH's questionnaire responses, forged steel "bars" are a fundamentally different product from forged steel fluid end "blocks." Section A Response, App. A-2 & A-3 (PR 58, CR 104); Section B Response, App. B-4 (PR 54, CR 92). Forged blocks are large solid steel blocks of rectangular or square cross section, having a very large cross-sectional dimension. Section B Response, App. B-4. By contrast, forged bars have a very small cross-sectional dimension and are normally forged in lengths of well over two meters. Id. Because of the small

[4] Although BGH specifically raised *Wheatland Tube* and Petitioners'sworn statements concerning the narrow scope of unfinished FEBs during this administrative review, Commerce did not address these issues in the final results. *See* BGH Case Brief, 14-15 (June 4, 2025) (PR 25, CR 10). A court may not take the place of the agency by analyzing and disposing of such "forgotten issues." Rather, the court must remand such issues back to the agency for further consideration. *See*, Provisur, 50 F.4th at 123-24; Nexteel, 28 F.4th at 1238.

cross-sectional dimension, forged bars are not suitable for incorporation into the fluid end assembly of a hydraulic pump. Forged bars also often have a configuration ("geometry")[5] that is fully unsuited to the production of fluid end blocks (*e.g.*, where the width can be more than two or three times the height). Id.

The forged bars sold in Germany during the POR were not produced by BGH Siegen but rather by an affiliated company, BGH Lippendorf. Because of their small cross-sectional dimensions, forged bars are produced on smaller, less powerful forging equipment. For example, BGH Lippendorf's forging press has a maximum force of only [ ] Meganewtons (MN) compared to the 40 MN forging press used by BGH Siegen. The manipulator at the BGH Siegen press, which rotates and maneuvers the ingot during forging, also has nearly four times the strength (*i.e.*, "tipping moment")[6] of the manipulator used by BGH Lippendorf. Section A Response, App. A-3, pp. 3-5 (PR 58, CR 104).

BGH Lippendorf's forging press and equipment is simply too small to produce fluid end blocks. The FEBs sold to the United States have a cross-sectional area of at least [ ] square feet (*i.e.*, width x height). Section A Response, App. A-2, p. 4 (PR 58, CR 104). Because of the very high pressures that FEBs must withstand, they require an exacting microstructure and specialized mechanical properties, which necessitates a very high forging reduction rate of at least ([ ]). This means that the ingot used as the raw material for the forged steel block must be [ ] times larger than the cross-sectional dimensions of the forged steel block. Moreover, to ensure the exacting microstructure and mechanical properties required of FEBs, the forging/compression of

[5] Configuration or geometry refers to the shape and size of the forging.

[6] The tipping moment is the point at which a manipulator cannot sustain the weight of a forging and will tip forward. Id.

the steel must penetrate all the way through the core of the ingot. There can be no "dead spaces" in the center of the ingot that have not been compressed and properly deformed. To achieve this high pressure, intensive core compression on FEBs, a large forging press with a force of at least 40 MN is required. Id. at pp. 3-4. BGH Lippendorf's forging equipment cannot fulfill these requirements.

None of this factual information has been contradicted or disputed. Accordingly, the factual information on the record of this current administrative review demonstrates that the forged bars sold in the home market did not meet the definitions of "fluid end blocks" in "finished condition" or "unfinished condition" and therefore did not qualifying as "subject merchandise" under 19 U.S.C. § 1677(25).[7]

Nevertheless, as it had done with respect to Military Equipment Forgings, Commerce simply ignored the definitions of fluid end blocks in "finished condition" and "unfinished condition" contained in the product scope when holding that "BGH's bars and custom blocks are in-scope and therefore constitute 'foreign like product' to be used in the dumping margin calculations." *See* Final IDM, 8 (PR 4). In fact, Commerce made no specific analysis or finding concerning forged bars but rather included bars within the general discussion of what Commerce referred to as "custom blocks." Id.

Accordingly, for the same reasons as discussed above with respect to Military Equipment Forgings, Commerce erred in finding that these products qualified as "foreign like product" (*i.e.*,

[7] Nor would the forged bars qualify as "other merchandise" with identical physical characteristics produced by the same person under the second part of section 1677(16)(A) since the forged bars are produced by BGH Lippendorf. Indeed, Commerce made no reference to the second part of section 1677(16)(A) in its final results.

"subject merchandise" under 19 U.S.C. § 1677(25) as incorporated by 19 U.S.C. § 1677(16)(A)) and including sales of these products in its margin calculations.

### 5. Commerce Failed to Properly Consider Differences in Product Type in Its Antidumping Calculations

Even if Commerce were found to have permissibly included forged bars and Military Equipment Forgings within the scope of subject merchandise, Commerce should have considered differences in product type in its antidumping calculations. The administrative record in this proceeding documents the significant differences between fluid end blocks and other forged steel products such as forged bars and Military Equipment Forgings. These other forged steel products have different sizes, configurations and chemical and mechanical properties than FEBs. They are also produced according to different customer specifications and for different markets and industries than FEBs. *See* BGH Case Brief, 18-25 (PR 25, CR 10). Due to these physical differences, home market sales of forged bars and Military Equipment Forgings should not be compared as identical merchandise to U.S. sales of FEBs in Commerce's dumping calculations.

Commerce may only treat products as identical if (1) they have no differences in physical characteristics or (2) the differences are only minor and "not commercially significant." Union Steel v. United States, 753 F. Supp. 2d 1317, 1322 (CIT 2011) (citing Pesquera, 266 F.3d at 1382-81 (Fed. Cir. 2001)). The administrative record documents the significant differences between fluid end blocks and forged bars and Military Equipment Forgings. This record evidence has not contradicted, nor has any party claimed that these physical differences are only minor and not commercially significant. As such, home market sales of forged bars and Military Equipment Forgings cannot be compared as identical merchandise to U.S. sales of fluid end blocks.

Accordingly, Commerce should have considered product type in its product comparisons. This does not require any change in the model-match criteria or the use of any data that has not already been timely submitted on the administrative record. Rather, the home market sales of forged bars and Military Equipment Forgings can be clearly identified using the product name reported in the field PRODNAMEH in conjunction with the code for the customer purchasing Military Equipment Forgings reported in the field CUSCODH. The home market sales of Military Equipment Forgings can also be identified by the entry of a specific customer drawing number in the field DRAWINGH.

Therefore, based upon this information, Commerce should have ensured that BGH Siegen's U.S. sales of fluid end blocks were not compared with any home markets sales of steel bar or Military Equipment Forgings in its margin calculations. Nor should the sales and costs data for forged bars and Military Equipment Forgings been used in the calculation of constructed value or CV profit. This treatment is analogous to how Commerce accounts for differences between prime and non-prime merchandise in its product matching. *See, e.g.,* Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375 (Fed. Cir. 2008).

### C. Commerce Improperly Modified its Differential Pricing Methodology During the Course of this Review

#### 1. Failure To Provide Adequate Due Process

On August 27, 2025, Commerce issued a "Post-Preliminary Analysis" stating that it was suddenly applying a modified differential pricing methodology in this review and that, as a result, it was increasing BGH's weighted-average dumping margin from 8.90% to 11.92%. *See* Post-Preliminary Analysis (Aug. 26, 2025) (PR 19). This came more than three months after Commerce published its preliminary results in this administrative review on May 14, 2025 and

just seven weeks before the then scheduled date for the final results of October 14, 2025.[8] Briefing had also been fully completed by June 11, 2025.

Commerce gave interested parties only one week, until September 3, 2025, to submit comments on the differential pricing analysis in the Post-Preliminary Analysis. Briefing Schedule for Post-Preliminarily Analysis (Aug. 26, 2025) (PR 17). BGH requested a two-week extension of this deadline, but Commerce extended the deadline by only one week. *See*, BGH Extension Request for Case Briefs on Post-Preliminary Analysis (Aug. 29, 2025) (PR 16); Extension of Deadline for the Submission of Case and Rebuttal Briefs (Aug. 29, 2025) (PR 15).

The Post-Preliminary Analysis represented a major change in the differential pricing analysis applied in this review and all previous segments of this proceeding. Such a major change in methodology should properly be raised at the beginning of a proceeding and no later than the preliminary results, thereby guaranteeing the parties' right to due process and allowing them adequate time to comment upon the methodological change and develop factual information on the record. Due process requires Commerce to provide parties with adequate opportunity to be heard "at a meaningful time and in a meaningful manner." *See* Royal Brush Mfg. v. United States, 545 F. Supp. 3d 1357, 1365 (CIT 2021) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)).

Commerce violated BGH's due process rights when it provided so little time for BGH to review and analyze the Post-Preliminary Analysis and the over 250 pages of programs and printouts disclosed with it. Commerce also failed to provide a reasoned and adequate explanation supporting its change in methodology.

[8] Commerce subsequently extended the deadline for issuing the final results by 30 days until November 10, 2025. Extension of Deadline for Final Results (Sept. 3, 2025) (PR 14).

The only reason provided by Commerce in its Post-Preliminary Analysis for the sudden change in methodology was that the Federal Circuit "recently held in *Marmen* and *Stupp* that it is unreasonable to use the Cohen's *d* test when the Cohen's *d* test is applied to data that do not satisfy certain statistical criteria of normal distribution, equal variances, and sufficiently numerous data." Post-Preliminary Analysis 1 (citing Marmen Inc. v. United States, 134 F.4th 1334 (Fed. Cir. 2025); Stupp Corp. v. United States, 2025 U.S. App. LEXIS 9616 (Fed. Cir. 2025) (non-precedential)) (PR 19). However, at the time of Commerce's Post-Preliminary Analysis, the remand proceedings in *Marmen* and *Stupp* were still ongoing. In fact, Commerce's remand results in *Marmen* were not issued until January 30, 2026, and the remand results in *Stupp* were not issued until March 16, 2026. *See* Marmen, No. 20-00169 (Jan. 30, 2026) (remand results) (ECF 101); Stupp, No. 15-00334 (March 16, 2026) (remand results) (ECF 278). In *Marmen*, the Court gave Commerce more than six months to prepare and file its remand determination, and the Court provided parties with over one month to submit comments in opposition to the remand determination. *See* Marmen, No. 20-00169 (June 17, 2025) (scheduling order) (ECF 95). In *Stupp*, the Court gave Commerce a full seven months to prepare and submit its remand determination, and the Court provided parties with almost two months to file comments on the remand determination. *See* Stupp, No. 15-00334 (June 30, 2025) (scheduling order) (ECF 273).

In light of the time provided by the Court to Commerce in *Marmen* and *Stupp* to prepare its remand determinations establishing its modified differential pricing analysis and to the other interested parties to comment upon the remand determinations, the meager two weeks that Commerce provided BGH to comment on the modified methodology in this review is fully inadequate.

It must be remembered that the original differential pricing methodology had been applied in every segment of these proceedings since the original investigation, and that no party objected to continued use of the methodology in this review. There was therefore no justified basis for Commerce, on the eve of the final results, to suddenly and unilaterally apply a modified differential pricing methodology that had not yet even been developed or submitted in the *Marmen* and *Stupp* cases.

Moreover, in its Post-Preliminary Analysis, Commerce simply gave a rough description of how its modified methodology was calculated, but it gave no explanation or analysis as to why the modifications were appropriate for the facts of this review. For example, Commerce simply stated that it was applying a two-percent price difference threshold but gave no explanation or analysis as to why that was appropriate under the facts of this review. *See* Post-Preliminary Analysis 3 (PR 19). Similarly, Commerce failed to provide any explanation or analysis as to why a threshold of more than 33% of the total value of U.S. sales was appropriate under the facts of this review. Id. Commerce also gave no explanation for discontinuing the use of the "mixed method" as a potential alternative comparison methodology as was done in the preliminary results. Id. at 1.

Commerce also failed to provide any explanation or analysis as to why it considered as "meaningful" a 25 percent relative change in the weighted-average dumping margins between the A-A method and the A-T method. Id. at 3. Indeed, the dumping margin results under both the A-A method and the A-T method would be the same. The only difference is that Commerce applies zeroing in its calculation under the A-T method. Zeroing is the practice whereby only positive dumping margins (*i.e.*, margins for sales of merchandise sold at dumped prices) are aggregated and negative margins (*i.e.*, margins for sales of merchandise sold at non-dumped

prices) are given a value of zero. *See* Dongbu Steel Co. v. United States, 635 F.3d 1363, 1371-73 (Fed. Cir. 2011) (finding that it was unreasonable for Commerce to continue the practice of zeroing in administrative reviews once Commerce decided to stop using zeroing in antidumping duty investigations to comply with WTO treaty obligations). Commerce's Post-Preliminary Analysis fails to even mention the use of zeroing in its revised methodology.

Commerce's failure to provide a reasoned explanation of its revised methodology in the Post-Preliminary Analysis deprived BGH of any adequate opportunity to comment upon the revised methodology in a meaningful manner thereby further violating BGH's due process rights. Commerce should therefore be prohibited from unilaterally applying a revised differential pricing methodology so late in this review.

**2. Commerce's Revised Differential Pricing Analysis Is Contrary to Law and Not Supported by the Administrative Record in This Review**

Commerce's revised differential pricing analysis continues to suffer from the same lack of statistical analysis and significance as found by the U.S. Court of Appeals for the Federal Circuit in *Marmen*. Indeed, in abandoning all statistical criteria and simply applying irrebuttable thresholds, Commerce has made its analysis less precise and incapable of determining any pattern of significant price differences as required by statute. Moreover, Commerce's revised differential pricing analysis has also not undergone a completed administrative rulemaking process. This analysis therefore cannot be applied in a general manner to this proceeding without proper consideration of the facts of this proceeding and proper modification.

Commerce is permitted to deviate from the normal rule of using the A-A method in calculating antidumping duties and use the A-T method only if the following two requirements are fulfilled:

> (i) there is a pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time, and
>
> (ii) {Commerce} explains why such differences cannot be taken into account using a method described in paragraph (1)(A)(i) or (ii).

19 U.S.C. § 1677f-1(d)(1)(B)(i) & (ii).

The current text of this section was added by Section 229 of the 1994 Uruguay Round Agreements Act, which added new section 777A(d) to the Tariff Act of 1930. As explained by the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), this statutory provision was expressly enacted to implement the provisions of Article 2.4.2 of the WTO Agreement on Implementation of Article VI ("WTO Antidumping Agreement"). *See* SAA, H.R. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4153 & 4177-78. The SAA states that the provisions of section 777A(d)(1)(B) of the Tariff Act (19 U.S.C. § 1677f-1(d)(1)(B)) were based upon a concern that the average-to-average methodology could conceal "targeted dumping," and the SAA refers to this provision as the "exception for targeted dumping." *See* SAA, 1994 U.S.C.C.A.N. at 4177-78.

Article 2.4.2 of the WTO Antidumping Agreement states:

> Subject to the provisions governing fair comparison in paragraph 4, the existence of margins of dumping during the investigation phase shall normally be established on the basis of a comparison of a weighted average normal value with a weighted average of prices of all comparable export transactions or by a comparison of normal value and export prices on a transaction-to-transaction basis. A normal value established on a weighted average basis may be compared to prices of individual export transactions **if the authorities find a pattern of export prices which differ significantly among different purchasers, regions or time periods**, and if an explanation is provided as to why such differences cannot be taken into account appropriately by the use of a weighted average-to-weighted average or transaction-to-transaction comparison.

WTO Antidumping Agreement, Art. 2.4.2 (emphasis added).

Commerce's modified differential pricing analysis makes no attempt to determine whether there is a "pattern" of "significant" price difference that could conceal "targeted dumping." Rather, Commerce irrebuttably applies a 2% price difference threshold without any analysis of the significance of this threshold to the facts of this case. The 2% price difference is based upon a simple average and is devoid of any standards of statistical significance. For example, the Cohen's *d* coefficient was calculated only when the test and comparison groups of data for a particular purchaser, region or time period each had at least two observations and when the sales quantity for the comparison group accounted for at least five percent of the total sales quantity of the comparable merchandise. *See* Preliminary IDM, 5-6 (PR 28). Commerce's modified methodology has removed all of these standards of statistical significance.

The fact that Commerce's modified methodology is less precise than the original methodology is easily seen in comparing the results of the two methodologies. Under the original methodology, only 63.59% of sales passed the first stage of the differential pricing analysis. Preliminary Analysis Memorandum (May 7, 2025) (PR 26, CR 20). By contrast, under the modified methodology, passing sales jumped to 82.73%. Analysis for Post-Preliminary Results (Aug. 26, 2025) (PR 19, CR 1).

Commerce also fails to explain why a 2% price difference is any indication of masked dumping in this case. At a price difference of 3.2%, the rate of passing sales drops below 62%, and at a price difference of 6.5%, the rate of passing sales drops below 30%.

Moreover, Commerce makes no analysis of the relationship of price differences to changes in the costs of production.[9] Commerce also fails to analyze any changes in U.S. price in relation to normal value. Commerce treats negative price differences the same of positive price differences and includes transactions and CONNUMs where no level of dumping exists. There are three U.S. CONNUMs that had no dumped transactions ([ ]). Accordingly, these CONNUMs, by definition cannot be a source of matched dumping, and Commerce should not have included them in its differential pricing analysis or applied zeroing to them.

Commerce's comparison of the 2% price difference threshold to the arm's-length test is misplaced. The purpose of the arm's-length test is simply to determine whether sales to affiliated customers should be considered as outside the ordinary course of trade and therefore removed from Commerce's dumping margin calculations. The result of Commerce's modified differential pricing methodology, however, is to apply a completely different calculation method with zeroing to all sales.

Similarly, Commerce's comparison of the 2% price difference threshold to the *de minimis* threshold for an estimated weighted-average dumping margin in an investigation is also misplaced. This *de minimis* threshold serves an entirely different purpose than the price difference threshold had has a completely different statutory basis. The *de minimis* threshold looks to the total estimated weighted-average dumping margin calculated for all CONNUMs and transactions regardless of the methods used to calculate normal value or U.S. price. The price

[9] As shown by BGH's quarterly cost submissions, costs changed substantially during the period of review. Response to Section D Supplemental Questionnaire, App. SD-11 (Apr. 29, 2025) (PR 30, CR 33).

difference threshold is focused solely on establishing a pattern of significant price differences. A more appropriate threshold would be the 25% threshold used by Commerce in its quarterly cost methodology to determine significant changes in the costs of production. *See* Officine Tecnosider SRL v. United States, 798 F. Supp. 3d 1363 (CIT 2025).

Commerce has also provided no reasoned explanation for its discontinuation of the "mixed method," stating only in a conclusory manner that "discontinuation of the 'mixed' method enhances the ability to address masked dumping." *See* Final IDM, 12 (PR 4). Under the mixed method, when the value of sales passing the first stage of the differential pricing methodology was more than 33% and less than 66% of the value of total sales, then Commerce applied the A-T method (with zeroing) only to those sales identified as passing the price test.

Indeed, there is nothing in the *Marmen* or *Stupp* opinions that calls the mixed method into question. In fact, in an earlier decision, the CAFC fully sustained the mixed method. In that earlier opinion, the CAFC explained that Commerce's approach of "providing a middle ground between 33% and 66%, in which the average-to-transaction method is only partially applied", "provides a better fit, minimizing both the assessment of antidumping duties that are too high and the assessment of duties that are too low." Stupp Corp. v. United States, 5 F.4th 1341, 1355 (Fed. Cir. 2021).

The purpose of 19 U.S.C. § 1677f-1(d)(1)(B) is to permit the deviation from the standard A-A method and permit the use of the A-T method when a "pattern" of export prices that differ significantly among purchasers, regions or periods of time cannot appropriately be taken into account by the use of the A-A method or the T-T method. Therefore, it is not simply a question of the number of price differences but the effect that these differences have upon the weighted average for a particular CONNUM.

According to the *Oxford Dictionary*, the word "pattern" means "a regular and intelligible form or sequence discernible in certain actions or situations." *See* United States – Antidumping and Countervailing Measures on Large Residential Washers from Korea, Report of the Appellate Body, WT/DS464/AB/R, para. 5.23 & n.108 (Sept. 7, 2016) (hereinafter "Korean Washers") (citing Oxford Dictionaries online, definition of "pattern"). Similarly, according to the *Random House Unabridged Dictionary*, "pattern" is defined as "a combination of qualities, acts, tendencies, etc., forming a consistent or characteristic arrangement." *Pattern*, Random House Unabridged Dictionary (2d ed. 1993). Likewise, the *Merriam-Webster's Collegiate Dictionary*, defines "pattern" as "a discernible coherent system based on the intended interrelationship of component parts." *Pattern*, Merriam-Webster's Collegiate Dictionary (11th ed. 2014).

All of these definitions confirm that the term "pattern" requires that the items being observed form a discernable sequence or arrangement. Therefore, based upon the plain meaning of the word "pattern," a simple identification of significant differences in prices is not sufficient to trigger the targeted dumping exception. Rather, these significant price differences must form a discernable sequence or arrangement evidencing targeted dumping.

In contrast to all of these standard definitions, Commerce defines pattern as "a frequent or widespread incidence." Final IDM, 14 (PR 4). Simply by lowering the price difference test threshold and eliminating all standards of statistical significance, Commerce can artificially increase the incidence of sales passing the test. This however does not show a pattern of significant price differences as required by statute. Rather, the combined result of Commerce lowering the price difference test threshold and eliminating the mixed methodology is to render the methodology unable of identifying a pattern of significant price differences as required by statute.

It is also important to remember that in 2006, the Appellate Body of the World Trade Organization ("WTO") determined that the United States application of the zeroing methodology to calculate dumping margins under the A-A method was inconsistent with the WTO Antidumping Agreement and that these findings have been implemented by the United States. Implementation of the Findings of the WTO Panel in US-Zeroing (EC): Notice of Determinations Under Section 129 of the Uruguay Round Agreements Act and Revocations and Partial Revocations of Certain Antidumping Duty Orders, 72 Fed. Reg. 25261 (Dep't Comm. 2007); *see also* Dongbu Steel Co. v. United States, 635 F.3d 1363, 1371-73 (Fed. Cir. 2011) (finding that it was unreasonable for Commerce to continue the practice of zeroing in administrative reviews once Commerce decided to stop using zeroing in antidumping duty investigations to comply with WTO treaty obligations).

It is therefore important that the differential pricing methodology not be so weakened that it permits application of the A-T method with zeroing when no pattern of significant price differences actually exists. Continued application of the mixed method is also an important factor in making sure that zeroing does not become the prevalent calculation method for all transactions.

Section 1677f-1(d)(1)(B) further requires that the pattern of significant price differences be found "**among** purchasers, regions, **or** periods of time." 19 U.S.C. § 1677f-1(d)(1)(B) (emphasis added). As stated in *Korean Washers*, the use of the words "among" and "or" in the context of "pattern" requires the investigating authority to consider each category (purchasers, regions and time periods) on its own when determining the existence of a pattern. Korean Washers, paras. 5.31, 5.32 & 5.33.

Commerce has failed to establish any pattern of price differences with respect to each category on its own. In fact, the revised differential pricing analysis is not in any way designed to analyze each category individually. When analyzing price differences for one category, the methodology fails to hold the variables for the other categories constant. For example, when comparing differences in prices among purchasers, Commerce does not hold the region or time period constant. Commerce therefore cannot determine whether a price difference is actually due to real differences between purchasers or simply due to the fact that the sales are to purchasers in different regions or during different time periods. This means that Commerce's methodology is incapable of identifying any pattern from the price differences.

In addition, Commerce does not consider each category on its own when determining whether price differences are significant. Rather, under its ratio test, Commerce simply adds together the value of sales to purchasers, regions ***and*** time periods that pass its test, and if the value of these sales accounts for 33% or more of the value of total sales, then Commerce applies zeroing in its margin calculations. This is done even if the price differences for some or all of the categories individually would not meet the threshold of significance. For example, in this review, less than 33% of the total value of sales passed the price difference test by region and less than 60% of the total value of sales passed the price difference test by period. There were no sales that passed the price difference test by purchaser.

It is also important to identify the price differences separately by category in order to determine whether the differences can be taken into account using the standard methods as required by 19 U.S.C. § 1677f-1(d)(1)(B)(ii). For example, if the price differences relate to time periods, the differences could be taken into account by applying the A-to-A method using shorter averaging periods as permitted by 19 C.F.R. § 351.414(d)(3).

Accordingly, Commerce's revised differential pricing analysis is contrary to law and not supported by the administrative record in this review.

## V. Conclusion and Prayer for Relief

For the reasons stated above, Commerce's final results are not supported by substantial evidence on the administrative record or in accordance with the law or other applicable legal standards. We therefore respectfully request that the Court remand this case to Commerce for redetermination with instructions consistent with the arguments set forth above and grant BGH such other further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ Marc E. Montalbine
Marc E. Montalbine*
J. Kevin Horgan
Merisa A. Horgan
**deKieffer & Horgan, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Date: September 18, 2026

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).

**Word Count Certificate of Compliance**

This brief has been prepared utilizing Word for Microsoft 365 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth in the amended scheduling order dated August 26, 2026 (ECF No. 23). Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **13,834** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ Marc E. Montalbine
Marc E. Montalbine*
**DEKIEFFER & HORGAN, PLLC**
1015 Fifteenth Street, N.W.
6th Floor
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: montalbine@dhlaw.de
*Counsel to BGH Edelstahl Siegen GmbH*

Date: September 18, 2026

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).